OPINION. Withey, Judge: Petitioner contends that fit is entitled to excess profits tax relief under section 722 (b) (4) of the 1939 Code[1] because the mechanization of its foundry in 1939 constituted a change in the character of its business by reason of a difference in the capacity for production or operation and did not reach by the end of the base period the level of earnings it would have reached had the qualifying change occurred 2 years earlier. The respondent has taken the position that the installation by petitioner of the duplex melting system, together with the sand-handling and mold-handling equipment and conveyer, in 1939, was a routine technological improvement which could not be considered as effecting a change in the character of the business under section 722 (b) (4). Respondent further contends that the foregoing installations were not productive of a higher level of earnings. Although petitioner has demonstrated to our satisfaction that it increased its capacity for the production of castings during the base period, careful consideration of the oral testimony and documentary evidence here presented has convinced us that it has failed to demonstrate that, assuming an increase in capacity for production and operation, such increase either did or, if occurring 2 years earlier, would have resulted in an increased level of base period net income. Wisconsin Farmer Co., 14 T. C. 1021; Green Spring Dairy, Inc., 18 T. C. 217. Manifestly, such an increase in earning capacity may result either from increased sales or from a decrease in operating expenses. Nielsen Lithographing Co., 19 T. C. 605. Petitioner’s income was realized primarily from the sale of a variety of finished products of which the castings produced by its foundry were only a part. Approximately 90 per cent of the castings produced by petitioner’s foundry were used in the manufacture of its finished products. However, except for its gross sales and net income for the base period years, petitioner has not presented sales data with respect to its finished products, nor is there a markedly upward trend of sales indicated thereby. We have no evidence before us tending to show the existence of a market for. its products, nor disclosing its ability to capture a share of the market. With respect to the portion of its rough castings sold to outside customers (approximately 10 per cent), petitioner’s sales manager testified that in his opinion if the mechanization of its foundry had occurred 2 years earlier, it would have been able to “push” the sale of its products with a competitive price due to an estimated decrease in the cost of production. Again, however, we are without proof as to the existence of an “outside” market, or as to petitioner’s ability to capture a portion of the market. The evidence before us bearing on the extent of the reduction, if any, in the cost of production resulting from its mechanization program is incomplete and not sufficiently reliable to enable us to compare the cost of production before and after mechanization. Although cost savings on certain items may have been realized by petitioner after mechanization, the record discloses that the net savings in costs to petitioner resulting from the use of the mold-handling conveyer and the duplex operation depend in part upon the number of breakdowns experienced and the cost of repairs and maintenance. No evidence as to the frequency of breakdowns of petitioner’s equipment, or as to the cost of repairs and maintenance, appears on the record before us. Further, it was established on the record that additional expenses resulting from the installation of the conveyor and duplex systems include the cost of limestone, coke, light and power, refractories, installation and maintenance of a metallurgical laboratory, melting steel, ferro-alloys, and depreciation expense. However, no evidence bearing on the extent of the increase in cost of any of the foregoing items was presented for our consideration. We consequently are unable to determine that petitioner actually realized a net saving in the cost of production as a result of its mechanization program in 1939. We are unable to find that, assuming the mechanization of its foundry had occurred 2 years earlier, petitioner would have reached a higher earning level by the end of the base period than it actually reached. Accordingly, petitioner has failed to sustain its burden of proof in that an increased base period net income is not shown to have resulted from the increase in productive capacity which it acquired by the mechanization of its foundry. Eeviewed by the Special Division. Decision will be entered for the respondent. SEC. 722. GENERAL RELIEF — CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. (b) Taxpayers Using Average Eabnings method. — The tax computed' under this sub-chapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— * ****** (4) the taxpayer, either during or immediately prior to the base period, commenced' business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term “change in the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public-press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business. * * *